**This order is SIGNED.**

**Dated: April 27, 2018**

**JOEL T. MARKER**
**U.S. Bankruptcy Judge**



IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

| In re: | Bankruptcy Case No. 17-20016 |
|---|---|
| STEVEN BROOK MILLARD, | Chapter 7 |
| Debtor. | Hon. Joel T. Marker |

**MEMORANDUM DECISION**

A law firm is a service business where the most valuable assets walk out the door each evening. From 2009 to 2015, Steven Brook Millard worked in the law office of Joseph Wrona. The two attorneys envisioned a profitable plaintiffs' practice where Wrona would provide financing, and the two would split any collection of contingent fees. However, the vision was not fulfilled, and Millard left Wrona's practice owing his employer over $260,000 under the fee-sharing agreement.

After Millard sought relief under chapter 7 of the Bankruptcy Code, the United States Trustee moved to dismiss Millard's case under § 707(b), disputing Millard's characterization of the Wrona debt as "non-consumer." The U.S. Trustee contends that the question of whether the debt was incurred primarily for a personal, family, or household

purpose is answered simply by looking at how the loan proceeds were spent. But that's not what the statute says, and controlling case law does not require that approach. Indeed, while it's clear that Millard spent the draws he received from Wrona almost entirely on household expenses, both Millard and Wrona entered into the split-fee arrangement with a profit motive in mind—and Millard's obligation to Wrona, on this record, is not a consumer debt. The Court issues the following memorandum decision to explain why the motion to dismiss is denied.[1]

I. Facts

Wrona and Millard first met during the summer of 2009.[2] The two began exchanging emails with terms for a new business venture in July of that same year.[3] Both attorneys expressed a desire to build what they hoped would become a lucrative contingency fee practice.[4] The attorneys believed success would follow due to Wrona's business management and Millard's experience as plaintiffs' counsel.[5]

Wrona agreed to issue monthly "draws" to Millard, but initially expressed hesitancy to extend credit of more than $8,000/month.[6] Nevertheless, Millard began receiving $10,000 draws in July of 2009. The draws came with an understanding that Millard would

---

[1] This memorandum decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1), made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 7051 and 9014(c). Any findings of fact herein are also deemed to be conclusions of law, and any conclusions of law herein are also deemed to be findings of fact, and they shall be equally binding as both.
[2] 3/20/18 Hearing Recording at 2:30:25 p.m. to 2:30:44 p.m.
[3] Exh. 7.
[4] 3/20/18 Hearing Recording at 2:32:44 p.m. to 2:35:23 p.m. and 4:52:14 p.m. to 4:53:46 p.m.
[5] 3/20/18 Hearing Recording at 2:32:44 p.m. to 2:39:18 p.m. and 3:00:34 p.m. to 3:00:40 p.m. In his testimony, Wrona identified himself as a "business owner" and a "business manager."
[6] Exh. 7.

2

repay Wrona as contingency fees came in at intervals.[7] Additionally, Millard would settle any negative balance in a "capital account" upon departure from the firm.[8]

At the heart of the agreement was a "split" arrangement. Both Wrona and Millard would receive 50% of the fees collected on Millard's cases after covering third-party costs of litigation.[9] Although some attorneys at Wrona's firm received a salary, that compensation arrangement was typically reserved for less-experienced practitioners, and Wrona was not interested in paying Millard a salary.[10] At trial, Wrona testified that he believed a split arrangement would encourage attorneys to work harder, exercise mature billing judgment, and feel a greater incentive to stay with the firm.[11] The design of the agreement was to establish a productive practice that earned more money for everybody.[12] This agreement differed from Millard's previous jobs where he had received a salary, as opposed to taking draws with his ultimate compensation wholly dependent on a split of contingency fees.[13]

In August of 2013, Wrona circulated a firm-wide written employment agreement.[14] The contract addressed the management of capital accounts.[15] Millard signed the agreement and continued to receive draws of $10,000/month against his capital account.[16]

---

[7] *Id*.
[8] *Id*. An email from Wrona additionally stated that Millard would be required to "sign a note to cover any deficits in [his] capital account . . . should [Millard] depart the firm."
[9] Exh. 7; 3/20/18 Hearing Recording at 4:02:08 p.m. to 4:02:23 p.m.
[10] 3/20/18 Hearing Recording at 2:32:55 p.m. to 2:40:59 p.m.
[11] 3/20/18 Hearing Recording at 2:33:54 p.m. to 2:35:23 p.m.
[12] *Id*.
[13] 3/20/18 Hearing Recording at 4:11:35 p.m. to 4:20:19 p.m.
[14] Exh. 7.
[15] *Id*.
[16] The agreement reiterated Millard's obligation to bring his capital account current upon departure from the firm, but additionally included an interest rate of 18% to accrue until the negative balance was repaid in full.

The amount due on Millard's capital account would rise and fall in the years to follow, but it often trended downward toward a greater negative balance.[17]

Millard resigned in an email to Wrona on November 30, 2015 with a negative capital account balance of $260,000.[18] Wrona had ceased providing Millard with monthly advances after October 23, 2015.[19] Wrona sued Millard on the debt in state court on December 18, 2015 and moved for summary judgment on July 27, 2016.[20] The Third District Court for the State of Utah awarded Wrona a judgment of $300,000 against Millard on December 23, 2016.[21]

Millard filed for chapter 7 relief on January 3, 2017, listing his obligation to Wrona as a "business debt."[22] The total debt on Millard's schedules was $954,004.21. Of that amount, $287,442 was undisputed non-consumer debt, and $366,551 was undisputed consumer debt, largely for Millard's outstanding mortgage obligation.[23] The characterization of Millard's debt to Wrona determines whether more than 50% of Millard's total obligations are consumer debts.

II. Discussion

Under § 707(b)(1) of the Bankruptcy Code, "the court, on its own motion or on a motion by the United States trustee, . . . or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts."[24]

---

[17] 3/20/18 Hearing Recording at 2:56:33 p.m. to 3:05:20 p.m.
[18] Exh. 4.
[19] Exh. 19.
[20] Exh. 6.
[21] Exh. 9. The $300,000 judgment included a principal amount of $261,151.81 and reduced interest at 18% of $38,841.19.
[22] Exh. 12.
[23] *Id*.
[24] The U.S. Trustee also moved for dismissal under § 707(b)(2) and (3). Joseph Wrona joined the motion. At trial, all parties agreed that the key issue was whether the Wrona claim was consumer

"[C]onsumer debt" is defined in § 101(8) as "debt incurred by an individual primarily for a personal, family, or household purpose." In addition to the statutory definition of consumer debt, the case law further distinguishes non-consumer debt "as a debt incurred with a profit motive"[25] or "on behalf of a business venture and commercial transaction."[26] But "profit *motive* does not mean profit *realized*. Motive necessarily looks to the reasons behind a course of action, it does not suggest that the course of action need come to fruition."[27]

In making the fact-specific, case-by-case determination of consumer debt, "it is appropriate to consider all the circumstances indicative of the debtor's primary purpose."[28] "The bankruptcy court should determine [a] debtor's initial purpose or intent in incurring the debt by evaluating the facts at the time the debt was incurred to avoid the impact of a debtor's recharacterizing the transaction, as the debtor did in *Stewart*."[29] And although the burden of going forward may shift,[30] the U.S. Trustee bears the ultimate burden of proving that Millard's obligation to Wrona is consumer debt by a preponderance of the evidence.[31]

---

or non-consumer debt. The parties additionally agreed that if the Court decided that the debt was non-consumer in nature, the inquiry would end, and the motion would be denied. But if the evidence showed that it was consumer debt, then further evidence on § 707(b)(2) and (3) would be necessary.

[25] *In re Stewart*, 175 F.3d 796, 806 (10th Cir. 1999) (citing *In re Burns*, 894 F.2d 361, 363 (10th Cir. 1990)).

[26] *In re Grillot*, 578 B.R. 651, 658 (Bankr. D. Kan. 2017); *see also Burns*, 894 F.2d at 363 (non-consumer debt if "incurred with an eye toward profit" or "for profit-seeking activities").

[27] *Palmer v. Laying [sic] (In re Palmer)*, 559 B.R. 746, 754 (D. Colo. 2016) (emphasis in original).

[28] *In re Cherrett*, 873 F.3d 1060, 1068 (9th Cir. 2017).

[29] *Id.* at 659.

[30] *Palmer*, 559 B.R. at 749, 756-67.

[31] *Stewart*, 175 F.3d at 806; *see also Grillot*, 578 B.R. at 656 (movant "bears the burden of proving that [a debtor's] case involves primarily consumer debts").

5

A. Incurred vs. Used

Again, "[c]ourts determine the debtor's purpose as of the time the debt was incurred."[32] Unfortunately, some of the case law uses the terms "incurred" and "used" loosely and even interchangeably, but these terms do not mean the same thing.[33] The statute requires the Court to "consider the purpose for which the debt was incurred. This naturally requires an inspection of the debtor's purpose or intent in incurring the [debt]."[34] If the debt is in the form of loans to the debtor, as it is here, then looking at how the funds were actually used can be a helpful, even critical, part of the analysis, akin to examining a course of performance to determine the existence and meaning of a contract. But use of the funds is not itself the test—it is only one of the factors to consider under the totality of the circumstances when determining the purpose for incurring the debt.

The U.S. Trustee correctly notes that the Tenth Circuit discussed the debtor's actual use of various loans in *Stewart*, but this Court sees no inconsistency between that case and this one. First, as with all cases involving this issue in both the trial and appellate courts, the factual record is key, and the Tenth Circuit made its conclusions in *Stewart* based on "the evidence in the record" before it.[35] The record in this case simply involves a different set of facts and circumstances than the record in *Stewart*.

---

[32] *Cherrett*, 873 F.3d at 1067.
[33] For example, the Tenth Circuit Bankruptcy Appellate Panel even used both terms in the same sentence in the *Stewart* case, ostensibly to mean the same thing: "Given this, the record demonstrates that the debt to the institutional lenders was **used** in part for family living expenses and **incurred** in part for personal reasons." *In re Stewart ("Stewart III")*, 215 B.R. 456, 466 (10th Cir. BAP 1997). A similar problem exists in the case law with the terms "non-consumer debt" and "business debt."
[34] *Palmer*, 559 B.R. at 753.
[35] *Stewart*, 175 F.3d at 807.

And second, a deeper dive into the record of the *Stewart* case reveals critical factual findings from the bankruptcy court in *Stewart I*—namely, that the debtor's Marital Settlement Agreement with his ex-wife "required Stewart to pay child support from his student loans in the amount of $500 per month per child for a total of $2,000 per month, as well as his children's health insurance and medical expenses . . . ."[36] The debtor later moved to modify his child support payments, alleging, among other things, that "his income from [his] employment is substantially less than the annualized amount of student loan proceeds that he had borrowed in prior years to meet his child support obligations; and that he is without the ability to borrow any further sums of money to meet the Court ordered child support obligation."[37]

So by the time it got to the Tenth Circuit, the record in *Stewart* already included specific findings that the debtor had agreed to incur additional amounts, beyond what he actually needed to fund his education, for the explicit purpose of paying child support. On that record, the Tenth Circuit had little trouble in concluding that the additional amounts were consumer debt. And despite the Tenth Circuit's choice to review how certain money was spent, consideration of that spending was not prescribed as the only method for determining whether debt was incurred with an "eye toward profit" or for "profit-seeking activities."[38]

In this case, Millard does not deny that almost all of his draws from Wrona were ultimately used to pay for his household expenses,[39] but he contends that the debt was actually incurred for the purpose of increasing potential returns to both himself and Wrona

---

[36] *In re Stewart ("Stewart I")*, 201 B.R. 996, 997 (Bankr. N.D. Okla. 1996).
[37] *Id.* at 998.
[38] *Burns*, 894 F.2d at 363.
[39] Exh. 11.

7

as part of a larger business agreement. Wrona similarly confirms that he and Millard obligated themselves to each other in this particular way to make more money in the future—certainly more than either one of them would have made if Millard had simply gone to work for Wrona as a salaried employee.[40] If there is compelling evidence of the parties' motives and intent at the time a debt is incurred, as there is here, then consideration of how the money was spent receives much less weight than it otherwise might.

The U.S. Trustee's position is simple—to determine motive, you look solely at how the funds were used. This Court disagrees. Although courts have looked at a debtor's use of money as one factor in a more extensive determination, the statute uses the word "incurred" as opposed to the word "used." Use may be instructive as a means of reviewing the full timeline of an agreement, but it is not the end in and of itself. How a debtor ultimately spends money may very well play a role in determining motive, but it is not necessarily the whole of the picture.[41]

B. Part of a Larger Transaction

Moreover, lending agreements often contemplate mixed motives. As such, it is important to consider the primary purpose of a transaction and to pinpoint the key motive at the time debt is incurred. A debtor may cite "multiple reasons" for incurring a liability, "pointing [a court's] inquiry toward determining his 'primary' purpose for doing so."[42] At trial, the U.S. Trustee established that Millard used his monthly draws to cover living

---

[40] 3/20/18 Hearing Recording at 2:32:44 p.m. to 2:39:18 p.m.; Exh. 7. In the agreement circulated to his firm, Wrona stated: "One of my goals in creating this Firm was to create an environment that empowered each of the attorneys to be entrepreneurial and to take responsibility for their productivity and the collection of fees."

[41] Indeed, the *Stewart* Court itself criticized courts that "failed to examine the purpose for which the debtor incurred the loans." *Stewart*, 175 F.3d at 806.

[42] *Grillot*, 578 B.R. at 657; s*ee also Cherrett*, 873 F.3d at 1068 ("It is appropriate to consider all the circumstances indicative of the debtor's primary purpose.").

8

expenses and that Millard was not responsible for the overhead costs of running Wrona's business. But the draws were part of a larger transaction.[43]

The $10,000 monthly loans served as start-up capital, which Wrona and Millard found particularly vital in the early stages of their business relationship.[44] Wrona had no history of running a contingency fee-based plaintiffs' practice, while Millard had both experience in the area and existing clients. Millard was tasked with obtaining future clients, prosecuting cases, and repaying the draws. All this was done with a hope that the fees collected would prove that Millard and Wrona had entered into a wise investment opportunity, providing a greater return than that of an hourly billing arrangement. The overarching aspirations were to build a book of business, cover third-party costs, repay draws, and most importantly, yield a sizeable dividend for the benefit of not only Millard but Wrona as well.

Millard's spending on household and family expenses shows his purpose for working at Wrona's firm, not necessarily his motive for obligating himself and entering into a unique borrowing arrangement with Wrona. Millard accepted the risk that a failure to repay his capital account would result in a negative balance, and he knew that Wrona would not be left holding the bag.[45] Millard's debt of $260,000 upon leaving the firm evidences the legitimate obligation he accrued each month that Wrona extended a $10,000 draw. Although Millard and Wrona dispute whether terms of their agreement varied throughout the years of Millard's employment, the record shows that Millard had notice that he was assuming financial risk from the beginning.[46] Were there no risk, Millard

---

[43] *See Cherrett*, 873 F.3d at 1069.
[44] Exh. 17.
[45] Exh. 7.
[46] *Id*.

would have taken his monthly payments free and clear as simply a salaried, wage-earning employee. Millard would not have indebted himself to Wrona for 26 months' worth of pay due to his failure to add value over an extended period of time. Although Millard was never an independent contractor with Wrona's firm,[47] the fee-sharing arrangement put Millard in the role of an employee debtor, not a creditor, for his services to his employer. By leaving a set salary off the table, Millard found himself without guaranteed compensation, liable for the equivalent of over two years' worth of work.[48]

Millard was obviously not the only party assuming risk under the split agreement. Wrona's testimony is evidence of his own investment purposes and profit motive. Wrona financed Millard's cases in hopes of receiving a greater return over a period of six years.[49] The aim of the agreement was not to pay Millard a set amount, but to yield a return on Wrona's advance. The goal was to bring in fees, repay the monthly loans in full, and add value above and beyond the capital infusion—and beyond what a salaried employee might be expected to generate. Additionally, Wrona's risk was that he might potentially lose "his

---

[47] In addition to exhibits 1 and 2, Wrona's testimony at trial established that even though Millard received draws from a capital account, he was also treated as a W-2 employee of the firm. While that information demonstrates Millard's status for tax purposes, and the discrepancy raises some interesting but ultimately immaterial questions about the validity of arguments made by Millard in the state court case (*see infra* n.48), it does not speak to the specifics behind the parties' agreement in terms of debts or credits.

[48] At trial, the U.S. Trustee tried to use Millard's positions in the prepetition state court lawsuit against him. In particular, one of Millard's arguments was that his monthly draw was really in the nature of salary, at least between 2009 and 2013 when the written employment agreement was signed. But Wrona himself assigned blame for that argument to Millard's state court counsel, not Millard himself. And more importantly, although this Court does not have the reasoning for Judge Pettit's decision in the record, it is clear from entry of the final judgment that Millard's salary argument was unsuccessful, so no preclusion or estoppel principles would apply. It is also worth noting that Millard has not changed his position about the Wrona debt in the course of this bankruptcy case, unlike the debtor in *Stewart*.

[49] 3/20/18 Hearing Recording at 2:35:25 p.m. to 2:35:40 p.m.

shirt," as he phrased in his testimony,[50] as is always a real possibility given the inherent nature of contingent fees.

Millard's motive, in seeking capital to fund his services as a plaintiffs' attorney, and Wrona's motivation, to make more money for his firm, show that the parties' primary purpose was to increase earning potential by working together under a specific business arrangement.[51] Both Millard and Wrona depended on each other, and their testimonies show that they believed they had worked out the best potential avenue toward a return on their respective investments.[52]

C. The Business of Providing Legal Services

Lastly, in his post-trial brief, the U.S. Trustee suggests that this Court "might be tempted to side step the analysis required in each case to determine the true purpose of the debt by determining that all debt incurred in relation to employment is 'business debt.'" That is simply not the case. The U.S. Trustee uses the examples of debt on a car that a debtor drives to work, or a new suit from Nordstrom. At trial, the U.S. Trustee also raised the hypothetical of student loan money being used to pay for a cruise, and he argued that it made no difference whether the lender was Wrona or Chase Bank given how Millard ultimately spent the money that he received from Wrona.

To be clear, the Court is not announcing any novel principles in this decision. And for obvious reasons, this issue does not lend itself to many broad generalizations or bright-

---

[50] 3/20/18 Hearing Recording at 3:01:19 p.m.
[51] 3/20/18 Hearing Recording at 4:56:57 p.m. to 4:57:10 p.m. On cross-examination by counsel for the U.S. Trustee, Millard testified: "My intent was to make money for Wrona Law Firm and myself—to profit from a contingency fee practice, which has the potential to create much greater income than a simple hourly practice."
[52] 3/20/18 Hearing Recording at 4:44:10 p.m. to 4:44:28 p.m. Millard's unchallenged testimony was that "we were [going to] make a bunch of money together. We were [going to] profit from my contingency practice and bring his firm a different source of income than it had been used to. . . ."

11

line rules, being dependent on the incredible variety of human economic interactions.[53] There may well be cases where the record supports a particular vehicle or clothing debt as a non-consumer debt, just as the opposite may be true. Although seemingly unlikely on its face, even a cruise paid for with student loan money might qualify as non-consumer debt under the right circumstances. And the identity of a lender may or may not matter depending on the situation. What matters is the specific record before this Court in this case, and on this record, the lender's identity does matter.

"There may be circumstances in which the debtor can demonstrate that [a] loan was incurred purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business."[54] And on this record, such circumstances have been shown. A legal practice is a quintessential service business, and the main assets of that business are a person's reputation, work ethic, and the grey matter between his or her ears. There are no dentist chairs to buy, no equipment for the kitchen, no rigs to put on the road. There is obviously some overhead, which Wrona agreed to pay himself, but the main capital investment is an investment in human beings—human beings who need to eat, sleep, clothe themselves, and take care of their families. There are no law firms without lawyers to staff them, and the cost of retaining them is as important as the purchase of any physical asset.

And yet, there is still nothing about these statements that necessarily requires any particular debt to be considered non-consumer just because it is between two lawyers in business together, whether as partners or employer and employee. But here, on this record,

---

[53] In *Stewart I*, the bankruptcy court even stated that if the idea is taken to its logical conclusion, "[f]ew human activities are entirely innocent of a profit motive . . . ." *Stewart I*, 201 B.R. at 1005.
[54] *Stewart III*, 215 B.R. at 465.

12

that is the result. Wrona and Millard, two sophisticated attorneys, intentionally decided to associate themselves together in a legal practice, with the goal of enriching themselves through successful development of a plaintiffs' contingency fee practice. In furtherance of this goal, they structured a unique draw/fee-splitting arrangement that was designed to incentivize Millard to achieve exceptional financial results.

Of course, it didn't. The parties didn't have to structure the deal that way. Wrona didn't have to pay for all of the overhead. Wrona didn't have to agree to a $10,000/month draw. And Wrona certainly could have cut off Millard much, much sooner, as Wrona himself admitted at trial, having discussed the increasingly negative capital account balance with Millard at least quarterly for several years.[55] Unfortunately, Wrona simply "made a bad bargain but with eyes open."[56]

In short, Millard did use his draws to pay for household expenses, but that was a key component in support of the parties' larger aim to maintain and motivate Millard as Wrona's business associate and human capital to achieve a hoped-for financial goal. As such, "[t]his is not the ordinary situation where a person takes out a loan to move closer to a job for convenience or better schools, for example. This is the unusual situation where a person accepts a loan from his employer as part of a larger transaction to further his career."[57]

### III. Conclusion

For the reasons stated above, the Court concludes that the U.S. Trustee has not met his burden to prove that the Wrona debt is a consumer debt. As such, over 50% of the

---

[55] 3/20/18 Hearing Recording at 2:56:33 p.m. to 3:05:20 p.m.
[56] *Stewart I*, 201 B.R. at 999.
[57] *Cherrett*, 873 F.3d at 1069.

Debtor's debts are non-consumer debts, and the case is not subject to dismissal under § 707(b)(1) as a case filed by an individual debtor "whose debts are primarily consumer debts." The U.S. Trustee's motion to dismiss is accordingly DENIED, and the Court will enter a separate order in accordance with this memorandum decision.

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

Steven Brook Millard
1758 East 1225 North
Layton, UT 84040

Joseph Wrona
Wrona Dubois, PLLC
1745 Sidewinder Drive
Park City, UT 84060

Laurie A. Cayton
U.S. Department of Justice
405 South Main Street, Suite 300
Salt Lake City, UT 84111